IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| QUINIQUE JAMES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:23-cv-02386-SHL-cgc |
| | ) |
| DENIS MCDONOUGH in his official | ) |
| capacity as Secretary, United States | ) |
| Department of Veterans Affairs, | ) |
| | ) |
| Defendant. | ) |

**ORDER DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT**

Before the Court are cross motions for summary judgment, both filed on June 17, 2024. (ECF Nos. 38 & 39.)[1] Defendant Denis McDonough, the Secretary of the United States Department of Veterans Affairs, filed his response to James's Motion and its supplements on July 15, 2024. (ECF No. 43.) With leave of Court, James filed her response to McDonough's Motion on July 17, 2024, two days after her original deadline. (ECF No. 48.) James filed her reply in further support of her Motion on July 29, 2024 (ECF No. 49), and McDonough filed his reply in further support of his Motion on August 30, 2024 (ECF No. 61), after having been granted three extensions of time to do so (ECF Nos. 51, 53 & 55.) For the reasons below, both motions are **DENIED**.

---

[1] Plaintiff Quinique James filed two supplemental motions the next day, which included exhibits that she failed to attach to the original motion based on technical issues with the Court's electronic filing system. (See ECF Nos. 41 & 42.)

## BACKGROUND[2]

This case involves claims that the United States Department of Veterans Affairs (the "VA") discriminated against James based on her gender by creating a hostile work environment through acts of sexual harassment, and then retaliated against her when she complained about the discriminatory acts. (ECF No. 1 at PageID 1.) James was employed at the VA hospital in Memphis, Tennessee, where she began working in March 2019 as a Food Nutritionist in Nutrition and Food Service ("NFS"). (ECF No. 48-1 at PageID 1501.) James's appointment was subject to a one-year initial probationary period (id. at PageID 1502), and she was promoted shortly after beginning working at the VA (ECF No. 43-1 at PageID 1391).

On December 13, 2019, James was sexually harassed by James Strawder, a cook at the VA, who followed James into a walk-in freezer and asked James if he could kiss her. (ECF No. 11 at PageID 63; ECF No. 43-1 at PageID 1391.) James immediately reported the incident to Jennifer Earnest, the VA's Assistant Chief Medical Center Director, and informed NFS management that Strawder "grabbed her arm and attempted to try to kiss her," and that she was shocked and offended by Strawder's actions. (ECF No. 11 at PageID 63–64; ECF No. 43-1 at PageID 1392; ECF No. 48-1 at PageID 1502.) Strawder confessed in a police report that the incident took place and admitted in the same report that he had previously sexually harassed another VA employee, an incident for which no adverse action was taken against him by the VA. (ECF No. 43-1 at PageID 1392.) James took time off after the December 13 incident. (Id.)

After the incident, Earnest issued Strawder a written notice that, based on the allegations and effective immediately, he would be temporarily reassigned to an Administrative Detail, pending the outcome of an investigation. (ECF No. 48-1 at PageID 1505.) Earnest told

---

[2] Unless otherwise noted, these facts are undisputed and are taken from the Parties' undisputed material facts or were admitted in Defendant's answer to the complaint.

Strawder to say away from James and not to come to the NFS work area for any reason. (Id. at PageID 1505–06.) Strawder remained on the premises and continued to work at the VA after the incident. (ECF No. 43-1 at PageID 1392.) Tiffany Truehill, who, as Section Chief, supervised James's supervisor, told James that she would have to "get used to seeing Mr. Strawder." (ECF No. 43-1 at PageID 1393.)[3]

Earnest's fact-finding resulted in her issuing a memorandum on December 18, 2019, that requested Strawder's removal for harassing and unwanted behavior and unbecoming conduct, based on his actions involving James. (ECF No. 48-1 at PageID 1506.) Strawder, who made no further sexual advances against James after the December 13 incident, resigned from the VA on January 2, 2020, prior to being removed pursuant to Earnest's recommendation. (Id.) On February 20, 2020, the VA provided James with a Memorandum of Record: Follow Up Harassment Allegations relating to the incident with Strawder, which advised James that the fact finding was completed and the VA took necessary corrective action. (Id. at PageID 1509.)

During James's tenure at the VA, she was reprimanded multiple times, including for being tardy and AWOL, and for multiple instances where she failed to fulfill her work duties. (See id. at PageID 1506–09.)[4] The frequency of the documentations increased after James reported the Strawder incident. (ECF No. 43-1 at PageID 1393.) Eventually, both Earnest and Truehill recommended James be terminated. (Id.) On March 5, 2020, the NFS's Associate Chief sent a memorandum to human relations at the VA, requesting James be terminated as a

---

[3] Defendant does not dispute that Truehill made this statement, but contends that she was merely advising James that Strawder was a veteran who receives medical services at the VA, and thus James would have to get used to seeing him around the facility. (Id.)

[4] James contests the motivation for, and validity of some of the examples the VA cites to support its claims that she was tardy, AWOL, or performed insufficiently on the job, and asserts that, in some instances, she had permission or was excused for the attendance issues. (See id.) But, in general, she does not dispute that she received such notices from the VA.

3

disciplinary action. (ECF No. 48-1 at PageID 1509.) The memorandum included eleven bases for James's termination, and nine of the incidents at issue occurred after James reported Strawder's harassment. (ECF No. 43-1 at PageID 1393.) The same day, Kristin Wilson, the VA's Senior Strategic Business Partner, Human Resources Management Service, issued a Termination during Probation Period Letter to James. (ECF No. 48-1 at PageID 1509.) Before terminating James, Wilson was unaware that she had filed a complaint with the VA concerning Strawder. (ECF No. 43-1 at PageID 1394.)

## ANALYSIS

### I. Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can prove the absence of a genuine issue of material fact by showing that there is a lack of evidence to support the non-moving party's cause. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Although the court views all evidence and factual inferences in a light most favorable to the non-moving party, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

The movant has the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The burden then shifts to the non-moving party to go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. Id. at 324 (quotations omitted). Ultimately, in evaluating the appropriateness of summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require

4

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251–52.

"The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." Appoloni v. United States, 450 F.3d 185, 189 (6th Cir. 2006) (quoting Parks v. LaFace Records, 329 F.3d 437, 444 (6th Cir. 2003)). So, "[w]hen reviewing cross-motions for summary judgment [courts] must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." Id. (quoting Westfield Ins. Co. v. Tech Dry, Inc., 336 F.3d 503, 506 (6th Cir. 2003)).

**II.     Discrimination Based on Sex**

"In order to establish a hostile work environment claim, an employee must show the following: 1) the employee is a member of a protected class, 2) the employee was subject to unwelcomed sexual harassment, 3) the harassment was based on the employee's sex, 4) the harassment created a hostile work environment, and 5) the employer failed to take reasonable care to prevent and correct any sexually harassing behavior." Bowman v. Shawnee State Univ., 220 F.3d 456, 462–63 (6th Cir. 2000) (citing Williams v. Gen. Motors Corp., 187 F.3d 553, 560–61 (6th Cir. 1999)). "Both an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." Id. at 463 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993)). Where, as here, the claim of harassment is based on the actions of a co-worker, not a supervisor, Defendant may be liable "if it knew or should have known of the charged sexual harassment and failed to implement prompt

5

and appropriate corrective action." Schlosser v. VRHabilis, LLC, 113 F.4th 674, 690–91 (6th Cir. 2024) (quoting Doe v. City of Detroit, 3 F.4th 294, 301 (6th Cir. 2021)).

In their Motion, Defendants assert that James has failed to demonstrate the fourth and fifth elements of her claim, namely that she "failed to show that the harassment unreasonably interfered with her work performance and created a hostile work environment," and she "failed to show that Defendant knew of any workplace harassment during Plaintiff's employment prior to the December 13, 2019 incident or failed to address the harassment that occurred on December 13, 2019 once Defendant became aware of it." (ECF No. 39-2 at PageID 199–200.)

In response to those arguments, James contends that she subjectively regarded the environment as abusive and the question of whether the harassment was objectively severe enough to have created a hostile work environment is a question for the jury. (ECF No. 48 at PageID 1491.) She further states that the VA knew of the issues and risks posed by Strawder based on several incidents involving him and other VA employees that preceded the December 13 incident. (Id. at PageID 1491–92.) Finally, she asserts that the steps the VA took in the wake of the incident were insufficient, and the "affirmative step that should have been taken was removing Mr. Strawder from the premises during the investigation, particularly considering Mr. Strawder's history, instead of leaving him in the hospital where he could potentially continue to either physically or emotionally harm [] James or other victims." (Id. at PageID 1493.)

Relatedly, in James's Motion, she asserts that she is entitled to summary judgment as she has satisfied each of the five elements of a hostile work environment claim and "because the VA blantan[tly] allowed for a serial harasser to continuously threaten Ms. James and other women after multiple reported instances." (ECF No. 38-1 at PageID 155.) She asserts that, "[e]ven if the argument was made that removing Mr. Strawder was a legitimate step to end the harassment,

6

it was not progressive to reflect the pattern of harassment that Mr. Strawder had displayed over the years." (Id. at PageID 160.) Moreover, by failing to remove "Strawder from the premises while the investigation was ongoing, they risked the safety of Ms. James, other employees, and patients at the VA by keeping a serial harasser in the building with little to no rational support for why that decision was made." (Id.)

Given the positions articulated in the Parties' respective motions, making a summary judgment determination as to James's hostile work environment claim requires the Court only to examine the fourth and fifth elements of such a claim, that is, whether Strawder's harassment created a hostile work environment and whether the VA failed to take reasonable care to prevent and correct any sexually harassing behavior. Because questions of material fact exist as to both of those elements, summary judgment is improper for either Party on the hostile work environment claim.

First, as to the fourth element and whether Strawder's actions toward James created a hostile work environment, the Court must determine whether the December 13 incident constituted severe or pervasive harassment. Defendant's Motion focuses largely on the fact that the single incident in the walk-in cooler cannot constitute pervasiveness. However, as Plaintiff points out, "severe or pervasive" is properly considered in the disjunctive. Barrett v. Whirlpool Corp., 556 F.3d 502, 514 (6th Cir. 2009) (citations omitted); see also Hickman v. Laskodi, 45 F. App'x 451, 454 (6th Cir. 2002) ("An isolated incident of harassment, if 'extremely serious,' is sufficient to create a hostile work environment.").

Nevertheless, in the reply Defendant asserts that "isolated—even physically invasive incidents like the December 13 incident are not objectively severe as a matter of law." (ECF No. 61 at PageID 1555.) Defendant cites to several out-of-circuit cases that "have found single

7

confrontations like the December 13, 2019 incident not to be severe or pervasive as a matter of law." (See id. at PageID 1556 (citing Bilal v. Rotec Indus., Inc., 326 F. App'x 949, 958 (7th Cir. 2009); Weiss v. Coca–Cola Bottling Co., 990 F.2d 333, 334-35, 337 (7th Cir. 1993); Hockman v. Westward Commc'ns, LLC, 407 F.3d 317, 328 (5th Cir. 2004).) Although those cases resulted in summary judgment rulings being upheld on appeal, the facts from those cases, the principles they articulate, and the law from subsequent decisions demonstrate why questions remain for the factfinder here, and therefore why summary judgment is inappropriate for either party.

For instance, in Bilal, the court explained that, whether physical harassment establishes a hostile work environment is evaluated on a continuum. So, at one end of the spectrum are unwelcome and uncomfortable physical contacts, such as a hand on the shoulder, a brief hug, or a peck on the cheek, which are "relatively minor." 326 F. App'x at 957–58. Acts that fall in the middle of the continuum, "such as a hand on the thigh, a kiss on the lips, or a pinch of the buttocks—may be considered insufficiently abusive to be described as 'severe' when they occur in isolation." Id. at 958. At the other end of the spectrum lies forced physical contact and touching of sexual body parts, such as touching a "breast near the nipple for several seconds" or groping a woman under her shorts and touching her underwear that "may be sufficient, even in isolation, to support a claim of hostile work environment." Id.

The court in Bilal found that the most egregious act alleged in that case—one of the plaintiff's co-workers taking a chocolate out of his mouth and putting it in hers—was bizarre and disgusting, but only constituted "middle-of-the-continuum" physical contact. Id. The court supported its conclusion that the incident with the chocolate and two others did not alter the conditions of the plaintiff's employment and create an abusive work environment in part by the

8

fact that she "was able to do her job effectively and had no desire to leave her job at the time she was terminated." Id.

The December 13 incident is not found in the middle-of-the-continuum and the record supports that the incident impacted James's ability to do her job and that she subjectively felt the environment was abusive. Defendant does not dispute that James took four days off of work after the incident, including two days to meet with a doctor through the VA's Employee Assistance Program, but instead asserts that she did not "seek a reasonable accommodation under the Rehabilitation Act for any purported symptoms she suffered from the alleged harassment, and she did not say that she took sick leave to go to the doctor for her blood pressure was because of Strawder's actions." (ECF No. 61 at PageID 1557.)[5] At the very least, it is a question of fact as to whether James's ability to do her job was impacted.[6]

Nor do the facts in this case resemble those from Weiss, where the plaintiff complained that her supervisor asked her for dates, called her a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs in her work area and attempted to kiss her in a bar, and possibly at work. 990 F.2d at 337. The court found those incidents were "relatively isolated" and did not rise to the level of seriousness that would support a claim of sexual harassment. Id.

As for Hockman, the Fifth Circuit explained that it and the case it relied on, Shepherd v. Comptroller of Public Accounts of the State of Texas, 168 F.3d 871 (5th Cir. 1999), applied the

---

[5] Defendant mischaracterizes James's testimony on this point. James testified that her blood pressure medication had to be increased after the incident. (See ECF No. 61-5 at PageID 1605–06.) She was asked, in a convoluted question, whether she told management that she had to take off work "because your blood pressure was up because of something related to Mr. Strawder," she responded "[w]ell, I never said it was related to Mr. Strawder." (Id. at PageID 1606.)

[6] In addition to the time taken off work and the impact on her health, James also testified that the incident forced her to relive the trauma of a childhood sexual assault. (ECF No. 48 at PageID 1491.)

9

wrong legal standard by requiring that a plaintiff establish that the reported conduct is both severe <u>and</u> pervasive, rather than severe <u>or</u> pervasive.  <u>Royal v. CCC & R Tres Arboles, L.L.C.</u>, 736 F.3d 396, 403 (5th Cir. 2013) (citing <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986)).  Applying the wrong standard, the court in <u>Royal</u> explained, "can lead to the wrong outcome."  <u>Id.</u> (citing <u>Harvill v. Westward Commc'ns, L.L.C.</u>, 433 F.3d 428 (5th Cir. 2005)).  So, too, here.

Finally, the case Defendant relies on from this District, <u>Moling v. O'Reilly Auto., Inc.</u>, 763 F. Supp. 2d 956 (W.D. Tenn. 2011), is similar to the facts here, but also distinguishable.  In that case, the plaintiff rebuffed her co-worker after he "leaned her back against the desk and attempted to kiss her on the mouth," and left the office they were in, but did not report the incident to management.  <u>Id.</u> at 960.  The court found that those acts, along with several other incidents involving the plaintiff and the same co-worker, did not demonstrate a hostile work environment.

Here, James alleges that Strawder, who is much taller than her, cornered her in a small walk-in freezer, grabbed her by the arm, stuck his tongue out and tried to kiss her, while peppering her with sexually suggestive comments.  There is no dispute that James reported the incident to management immediately after it happened.  Strawder's actions are of the physically invasive sort that, though isolated, support a claim of hostile work environment.  Because there is a question of material fact as to the fourth element of James's claim, summary judgment would be inappropriate on these grounds.

Similarly, there is a question of material fact as to fifth element of the hostile work environment claim, that is, whether the VA failed to take reasonable care to prevent and correct any sexually harassing behavior.

Defendant asserts that "Plaintiff has failed to show that Defendant knew of any workplace harassment during Plaintiff's employment prior to the December 13, 2019 incident or failed to address the harassment that occurred on December 13, 2019 once Defendant became aware of it." (ECF No. 39-2 at PageID 200.) Plaintiff counters that the record shows that the VA knew of workplace harassment prior to the incident with James and that the steps it took in the wake of the December 13 incident were insufficient.

The Parties do not dispute that the VA knew of the December 13 incident and almost immediately thereafter reassigned Strawder to another area of the VA. The question is whether the actions it took were appropriate and what impact previous incidents involving Strawder's actions toward his other co-workers have on that analysis.

The applicable standard for determining whether the VA is liable for co-worker harassment, is whether it "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." (ECF No. 61 at PageID 1558 (quoting Doe, 3 F.4th 294 at 301).) So, strictly speaking, whether Defendants took prompt and appropriate corrective action in response to previous incidents involving Strawder is not directly relevant to determining their potential liability as to James's claims. However, the incidents and the VA's knowledge of them can certainly inform whether the corrective action they took after the December 13 incident was appropriate.

The Sixth Circuit confronted similar circumstances, and similar arguments, in Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321 (6th Cir. 2008). That case, like this one, involved claims of sex discrimination and retaliation, and involved an employee who had also previously been accused of inappropriate behavior toward his fellow brewery employees. The court in Hawkins explained that "[a]n employer's responsibility to prevent future harassment is heightened where

11

it is dealing with a known serial harasser and is therefore on clear notice that the same employee has engaged in inappropriate behavior in the past." 517 F.3d at 341. Ultimately, because the employee who was accused of harassment in that case had committed harassing acts in the past, the Defendant was "liable if its response to [plaintiffs'] complaints demonstrates an attitude of permissiveness and was not reasonably calculated to end [the] pattern of harassment." Id.

The defendant in Hawkins argued that it responded appropriately to the allegations by separating the two employees, launching a prompt investigation that included interviewing numerous employees, and sending the alleged victim a letter at the conclusion of the investigation stating that retaliation would not be tolerated. Id. The Sixth Circuit rejected the defendant's arguments that simply separating the harasser and his victim was sufficient to preclude liability. Id. at 342.

There is no question that the VA knew of acts of harassment by Strawder that preceded the December 13 incident. James points to an incident from five months earlier, where Strawder was accused of placing his hand on the neck of Laquita Hackworth, another female VA employee. Donnell Spruiell, the VA's employee relations/labor specialist, exchanged emails with Earnest, Truehill, and others at the VA regarding the incident. Spruiell concluded in an email to Earnest and Truehill that he "would recommend at least an admonishment. The employee told him twice to stop touching her! You have two prior incidents that were investigated in the past for almost the same thing. I would stop this with an admonishment for inappropriate touching of an employee." (ECF No. 41-4 at PageID 914.)[7]

---

[7] The Secretary acknowledges that "the VA was aware that [Strawder] had been 'inappropriate' with Hackworth, but Hackworth did not tell the VA that Strawder's actions were 'sexual in nature.'" (ECF No. 61 at 1557–58.) Spruiell's description of Strawder's actions in the incidents involving Hackworth and others, suggest there is little space between "inappropriate" and "sexual in nature."

12

Considering these previous incidents, including one from just months before the December 13 incident in which Strawder sexually harassed James, there is a question of material fact as to whether merely assigning Strawder to another area of the VA facility while an investigation was conducted was an appropriate corrective action. As the court in Hawkins explained, "[a] company faced with a pattern of harassment must both respond appropriately and take increasingly effective steps designed to end the harassment." 517 F.3d at 344. Although the VA promptly investigated the December 13 incident and recommended termination of Strawder a short time later, a factual question remains as to whether the actions the VA took in the interim were appropriate. As Defendant points out, "a harassment victim may not dictate an employer's action against a co-worker." (ECF No. 61 at PageID 1558 (citing Doe, 3 F. 4th at 302–03).) And just as was the case in Hawkins, "[t]his is not to say that a jury will necessarily determine that [defendant] responded inappropriately." 517 F.3d at 344. But James, like the plaintiff in Hawkins, has raised a genuine issue of material fact as to whether the VA's acts were a reasonable remedy under these circumstances.

The cases the Secretary cites to support his argument that moving Strawder to another part of the building was a sufficient corrective action are generally distinguishable. For example, in Newton v. Ohio Dep't of Rehab. & Correction-Toledo Corr. Inst., the plaintiff was placed on leave during the investigation into her allegations against her co-worker, which ensured she would have no contact with him. 496 F. App'x 558, 566 (6th Cir. 2012). Similarly, in Gwen v. Reg'l Transit Auth., immediately after the defendant was made aware of an incident involving one of its employees exposing himself to a co-worker, it gave the accuser the day off work and

suspended the offender for thirty days. 7 F. App'x 496, 498 (6th Cir. 2001).[8] Although the court in Mullins v. Goodyear Tire & Rubber Co., found that the corrective action the employer took—which included instructing the accused to avoid the plaintiff—was sufficient, the defendant's history in that case involved sabotaging the machine of his co-worker, and was not sex-based harassment. 291 F. App'x 744, 749 (6th Cir. 2008). As outlined above, that was not the case with Strawder. There is a question of fact, especially considering Strawder's previous acts, as to whether in its response to the December 13 incident, the VA "failed to act in good faith by fashioning a remedy so inadequate and inappropriate that it displayed an attitude of permissiveness amounting to discrimination." Gwen, 7 F. App'x at 502.

Because there are questions of material fact as to the fourth and fifth elements James must prove for her hostile work environment claim, both Parties' motions for summary judgment as to Count I are **DENIED**.

### III.     Retaliation

Demonstrating a claim for retaliation under Title VII requires a plaintiff to show that she 1) engaged in a protected activity, 2) the employer knew of the exercise of the protected right, 3) the employer took adverse employment action against her or subjected her to severe or pervasive retaliatory harassment by a supervisor, and 4) there was a causal connection between the protected activity and the adverse employment action or harassment. Wyatt v. Nissan N. Am., Inc., 999 F.3d 400, 419 (6th Cir. 2021) (citing Morris v. Oldham Cnty. Fiscal Ct., 201 F.3d 784, 792-93 (6th Cir. 2000)). At the prima facie stage, the plaintiff's burden is "minimal and easily

---

[8] The plaintiff in Gwen, a bus driver for the Cleveland Regional Transit Authority, never returned to work after the incident. Id. Although she asserted that other incidents of harassment preceded the exposure, those previous incidents were never reported to her employer. Id. at 501.

14

met." Wyatt, 999 F.3d at 419 (citing E.E.O.C. v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997)).

Where, as here, a plaintiff relies on circumstantial evidence of retaliation, the Court applies the burden-shifting analysis set forth in the Supreme Court's opinions in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Taylor v. Donahoe, 66 F. Supp. 3d 993, 1000 (W.D. Tenn. 2014) (citations omitted). Under this burden-shifting framework, plaintiffs have "the initial burden to establish a prima facie case of retaliation." Id. (quoting Imwalle v. Reliance Med. Prods., 515 F.3d 531, 544 (6th Cir. 2008)). If the plaintiff satisfies this low burden, the defendant then "has a burden of production to articulate a nondiscriminatory reason for its action. If the defendant meets its burden, the plaintiff must prove the given reason is pretext for retaliation." Wyatt, 999 F.3d at 419–20 (quoting E.E.O.C. v. Ford Motor Co., 782 F.3d 753, 767 (6th Cir. 2015)).

Defendant concedes that James has met her burden as to the first three elements of a prima facie case for retaliation. (ECF No. 39-2 at PageID 205.) However, the Secretary asserts that "Plaintiff's retaliation claim must fail because she did not demonstrate that a causal connection exists between her protected activity and the adverse action taken against her." (Id.) James counters that the temporal proximity between her complaint for harassment and her termination—that is less than ninety days—demonstrates the causal connection necessary to satisfy the fourth element of her retaliation claim. (ECF No. 38-1 at PageID 162.) Moreover, she asserts that there is evidence that the reasons the Secretary offered for her dismissal are pretextual, specifically under a cat's paw theory, under which she seeks to hold the VA responsible "for a biased supervisor who did not make the ultimate employment decision, but

15

rather influenced the person who did make the decision." (Id. at PageID 161 (citing Wyatt, 999 F.3d at 419).)

The Parties dispute whether temporal proximity, standing alone, can satisfy a plaintiff's prima facie burden. Although the authorities from and within the Sixth Circuit appear conflicting, the explanation from Mickey v. Zeidler Tool & Die Co., reconciles the seemingly contradictory authority. There, the Sixth Circuit explained:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

516 F.3d 516, 525 (6th Cir. 2008). "[P]revious cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months." Nguyen v. City of Cleveland, 229 F.3d 559, 566–67 (6th Cir. 2000); see also Seeger v. Cincinnati Bell Tel. Co., LLC, 681 F.3d 274, 283 (6th Cir. 2012) (collecting cases where the adverse employment action occurred within three months of the protected activity were deemed to be suggestive of retaliation).

James's firing occurred eighty-three days after she endured and reported the December 13 incident, which is within the narrow window of time necessary to demonstrate a causal connection between the two events. But even if that were not enough, this is not an instance of her retaliation case otherwise being weak. See Nguyen, 229 F.3d at 567. As James has detailed in her briefing, although she did face some disciplinary action before the December 13 incident, the frequency of her alleged transgressions spiked in the weeks after, and there exists questions of fact as to their legitimacy and as to what motivated them.

The last point also helps illustrate that, although the VA has satisfied its burden of offering legitimate, non-discriminatory reasons for terminating James as it is required to do under the McDonnell-Douglas burden shifting framework, James has satisfactorily raised an issue of material fact as to whether those reasons were merely pretextual.

The VA asserts that there were multiple legitimate non-discriminatory reasons for James's termination, including her work performance and that her "attendance records raised concerns of sick leave abuse in that she was frequently calling in late, requesting unplanned leave without prior notice, and taking sick leave in conjunction with a scheduled day off." (ECF No. 39-2 at PageID 208.)

James, who bears the burden of showing the VA's proffered reasons for her termination were pretextual, can do so by showing that a proffered reason "had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to motivate the defendant's challenged conduct." Lefevers v. GAF Fiberglass Corp., 667 F.3d 721, 725 (6th Cir. 2012) (quoting Schoonmaker v. Spartan Graphics Leasing, LLC, 595 F.3d 261, 268 (6th Cir. 2010)).

As a starting point, although temporal proximity alone is insufficient to satisfy James's burden at this stage, the suspicious timing described above "is a strong indicator of pretext when accompanied by some other, independent evidence." Bell v. Prefix, Inc., 321 F. App'x 423, 431 (6th Cir. 2009) (quoting DeBoer v. Musashi Auto Parts, Inc., 124 F. App'x 387, 393–94 (6th Cir. 2005)). There is additional independent evidence.

James asserts that she "was such an exemplary employee that she received a raise for her performance mere months before she engaged in the protected activity." (ECF No. 48 at PageID 1495.) James asserts that, although she was reprimanded for poor work habits, she was

17

instructed that she could continue to perform her work in the allegedly inadequate ways and that her tardiness could be excused as long as she notified her supervisor ahead of time. (Id. at PageID 1496.)

Moreover, James alleges—and points to evidence in the record—that Truehill made statements, including that James should get used to seeing Strawder, that a factfinder could view as containing retaliatory animus. Beyond that, the fact that Truehill recommended James's termination to Wilson, her supervisor, without informing Wilson of the December 13 incident, is also suggestive of retaliatory animus. Wilson, who issued the Termination during Probation Period Letter to James, acknowledged that having known of the December 13 incident "definitely would impact my decision" to terminate James. (ECF No. 41-7 at PageID 1099.) Under the cat's paw theory of liability advanced by James, there is a question of material fact as to whether Truehill was the sort of biased supervisor who inappropriately influenced Wilson's decision.

The cases the VA relies on do not undermine this conclusion. The VA contends that the attendance and performance issues that James was cited for between the December 13 incident and her termination were consistent with issues that she was cited for in her first eight months on the job preceding her harassment. The VA asserts that the disciplinary actions that it took against James after the December 13 incident were merely continuing "along lines previously contemplated" and were therefore "permissible and not indicative of pretext." (ECF No. 61 at PageID 1561) (citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001)). The VA further asserts that "continued—but not additional—scrutiny" of a plaintiff after a protected activity does not indicate pretext. (Id. (citing Nixon v. Donahoe, No. 11-784, 2013 WL 5460310, at *2 (S.D. Ohio Sept. 29, 2013)).

The problem with those arguments is, as the VA acknowledges, the documentation of James's issues increased after James reported the Strawder incident. (See ECF No. 43-1 at PageID 1393.) James has demonstrated that there is a question of material fact as to whether the scrutiny was not merely a continuation, but instead, was additional. It is possible, of course, that James's performance and attendance issues got worse in the weeks between the December 13 incident and her termination, which caused the number of admonishments the VA issued to her to increase so dramatically. However, that question is appropriately answered at trial, not at summary judgment.

Just as material facts exist as to James's claim for discrimination based on sex, they also exist for her claim for retaliation. The motions for summary judgment as to Count II are therefore **DENIED**.

## CONCLUSION

For the foregoing reasons, the motions for summary judgment filed by the VA and James are **DENIED**.

**IT IS SO ORDERED,** this 17th day of December, 2024.

s/ Sheryl H. Lipman<br>
SHERYL H. LIPMAN<br>
CHIEF UNITED STATES DISTRICT JUDGE